30 A.3d 359

PAMELA DUDAS, PLAINTIFF, v. JAMES
M. DUDAS, DEFENDANT.

Superior Court of New Jersey
Chancery Division Ocean County
Family Part

Decided April 11, 2011.

*Pamela Dudas,* plaintiff, pro se.

*M. Joseph Kurzrok,* for defendant.

L.R. JONES, J.S.C.

In this case, a supporting spouse's (husband's) income substantially increased between the date of the filing of the divorce complaint and the date of the divorce trial. The issue is whether the court may consider this post-complaint increase in determining the amount of alimony which the husband must pay to the wife.

The court holds in this case that the husband's post-complaint increase in income is relevant, and may be considered in determining the extent of his alimony obligation to his wife.

Plaintiff-wife and defendant-husband wed on July 25, 1981. They subsequently lived together for twenty-six years, raising two sons. Throughout the lengthy marriage, plaintiff was principally a homemaker and caretaker for the children, taking on sporadic part-time employment which never exceeded $18,000 in any year. Conversely, defendant was the household's primary financial pro-

vider, working for virtually the entire marriage as a W–2 employee in auto part sales. Spending years developing expertise in his field, defendant's income steadily rose from approximately $14,000 at the beginning of the marriage to the mid-$40,000 range, with a one year high of $59,000 by the end of the marriage. While there was a brief period of time when defendant left his W–2 employment in an attempt to start his own auto part business, that venture quickly proved unsuccessful and defendant shortly thereafter returned to W–2 employment in auto part sales. In no year prior to the divorce litigation did defendant ever earn in excess of $60,000.

During the last decade of the marriage, plaintiff planned to pursue a career in psychology. She attended community college and achieved a straight-A, 4.0 grade point average towards an associate's degree. However, by agreement of both parties she discontinued her college attendance prior to earning a bachelor's degree in order to invest available time and resources into supporting defendant's attempt to build his auto part business.

The parties permanently separated in 2007 and plaintiff filed a divorce complaint in 2008. The litigation was administratively dismissed for procedural reasons and plaintiff thereafter filed a new divorce complaint under the present docket number. Between the date of the original complaint in 2008 and the divorce trial in 2011, defendant's W–2 income in auto part sales sharply jumped to a personal high of $64,000 in 2009, and then ballooned again to $76,000 in 2010. In 2011, defendant is on pace to earn $68,000. He has now achieved national ranking in his employer's company as one of its most successful salespersons. Accordingly, defendant's post-marriage annual earnings are at a level markedly higher than his earnings during the marriage.

Plaintiff presently seeks alimony from defendant, and contends that the court should consider defendant's increased, post-complaint income as part of the support analysis. Conversely, defendant urges that the court should not consider his post-complaint income, and instead should limit the alimony analysis to

the income he earned during the marriage up to separation and the inception of litigation. Defendant argues that his post-complaint earnings are irrelevant because, (a) alimony should be based upon the parties' marital standard of living, and (b) that standard of living was never based on the heightened level of earnings he presently enjoys.

While on the surface there may appear to be logic and an attractive simplicity to defendant's position, the financial complexities of divorce weigh heavily against completely excluding defendant's post-complaint income from consideration in the alimony analysis. This is especially true in a court of equity, where the goal is to reach a result which is economically fair and equitable to both parties. The court finds in this case that both defendant's pre-complaint income history and his current, post-complaint income history are relevant in equitably determining defendant's alimony obligation to plaintiff.

As a starting point in the alimony analysis, a court must consider the enumerated statutory factors for consideration set forth *N.J.S.A.* 2A:34–23(b). These factors include:

(1) The actual need and ability of the parties to pay;

(2) The duration of the marriage or civil union;

(3) The age, physical and emotional health of the parties;

(4) The standard of living established in the marriage or civil union and the likelihood that each party can maintain a reasonably comparable standard of living;

(5) The earning capacities, educational levels, vocational skills, and employability of the parties;

(6) The length of absence from the job market of the party seeking maintenance;

(7) The parental responsibilities for the children;

(8) The time and expense necessary to acquire sufficient education or training to enable the party seeking maintenance to find appropriate employment, the availability of the training and employment, and the opportunity for future acquisitions of capital assets and income;

(9) The history of the financial or non-financial contributions to the marriage or civil union by each party including contributions to the care and education of the children and interruption of personal careers or educational opportunities;

(10) The equitable distribution of property ordered and any payouts on equitable distribution, directly or indirectly, out of current income, to the extent this consideration is reasonable, just and fair;

(11) The income available to either party through investment of any assets held by that party;

(12) The tax treatment and consequences to both parties of any alimony award, including the designation of all or a portion of the payment as a non-taxable payment; and

(13) Any other factors which the court may deem relevant.

While all of the thirteen enumerated factors must be considered, the court will specifically address four of these factors in this opinion as particularly relevant to the legal issue at hand.

The first such factor is "actual need and ability of a party to pay." The language in the statute clearly directs an analysis of the parties' present needs and ability to pay, and does not in any fashion artificially limit the judicial analysis only to the past needs of the supported spouse during the marriage or the past ability of the supporting spouse to pay. If the Legislature had intended for an alimony analysis to be capped at the level of income previously earned by the parties during the marriage, such limiting language could have easily been included in the statute itself.

The fourth enumerated factor is the "standard of living established in the marriage." Defendant essentially contends that the "standard of living" factor is the predominant consideration, to the virtual exclusion of all others. However, the statute clearly requires the court to consider more than simply the standard of living. This factor does not stand alone, but rather is to be analyzed in conjunction with all of the other enumerated factors including present needs and ability to pay. Defendant's present additional income may be a potential funding source to enable both parties to approach and/or maintain the prior marital lifestyle while living separately.

The fifth listed factor is the "earning capacities of the parties", which inherently includes consideration of one's earning potential even beyond that actually earned during the marriage. Through his present post-complaint earnings, defendant demonstrates an

earning capacity significantly greater than that actually achieved during the marriage. The alimony statute expressly authorizes and directs inclusion of this consideration in the support analysis.

The thirteenth statutory factor directly authorizes and directs the court to consider "any other factors which the court may deem relevant." This court finds that there are two additional factors which are relevant in this case and which directly implicate defendant's post-complaint, increased earnings: The first additional factor is the financial principle of "marginal cost estimation", and the second additional factor is the legal principle of "momentum of the marriage".

### ADDITIONAL FACTOR # 1: MARGINAL COST ESTIMATION

In considering the parties' marital lifestyle and standard of living, there are natural economic differences between a couple living together in one single, intact household and living separately in two distinct households.

In this case, plaintiff and defendant resided in one single, intact household for over a quarter of a century. During most of that time, the parties primarily funded their joint budget via defendant's W–2 income in auto part sales. Living together, the parties shared common household expenses. The evidence reflects that the parties lived a modest, conservative, but relatively comfortable middle class lifestyle. Prior to separation, the parties had a reasonably estimated combined monthly marital budget of approximately $4000 a month while living in a single intact household. This amount did not include additional child-related expenses which traditionally had been part of the parties' budget in raising their sons.

Once defendant moved out, the parties established separate households under separate roofs. However, this division did not mathematically mean that the parties' monthly budgets were neatly cut in half so that each party now only needed fifty percent of the prior monthly budget (i.e., $2000 per month rather than

$4000 per month), to separately afford the former marital lifestyle. When one household divides into two, the economies of pooled or shared expenses largely evaporate. Each party has his/her own separate roof expense (mortgage or rent), utilities, costs, food/household supplies, etc. Conversely, the cost of maintaining a single person household may not be as radically different from a dual person household as one might initially think.

Financial experts have long recognized the concept of "marginal cost estimation", which focuses on the extra cost of supporting an additional person in a family unit. In the context of child support analysis, this principle is expressly adopted into the New Jersey Child Support Guidelines. Recognizing the economies of shared/pooled expenses in a household, the Guidelines state:

> Economists estimate that approximately 65% of household spending is for pooled items (e.g., a car, a washing machine, or a box of laundry detergent used in common by all household members). Even for goods that are privately consumed (e.g., clothing, food), expenditure surveys are not detailed enough to link individual household members (adults or children) to a particular expenditure. Together, pooled and privately consumed goods account for about 90% of total household expenditures.... [E]conomists use an indirect method of determining child-rearing costs known as marginal cost estimation. Marginal cost estimation attempts to find the added cost of a child to a family by comparing the expenditures of families considered equally well off economically and have different numbers of children. For example, if two families (one with and one without a child), are equally well off, the additional expenses of the family with the child are assumed to be the marginal cost of the child.
>
> [Child Support Guidelines, Pressler & Verniero, *Current N.J. Court Rules*, Appendix IX–A, note 5 to *R.* 5:6A at 2430 (2011).]

The effect of pooled expenses on household economics can be significant and the cost of two people living together is not automatically twice the cost of one person living alone. For example, under Appendix IX–F of the Child Support Guidelines, when combined parental net weekly income is $1000 per week, child support for one child is $232 per week. For two children, support is not twice that amount, but only $317 per week. For three children the support figure is only $367 per week. *Id.* at 2504. The amount of support does not double or triple with each additional child on a pro rata basis, but rather increases at a

diminishing rate due to the recognized economies of pooling expenses.

While the Guidelines address marginal-cost estimation in the context of a child support analysis, this economic principle is just as relevant and pertinent in an alimony analysis. In many divorce cases, the reality is that when the parties separate and one household becomes two, there is insufficient money available at the parties' prior income levels for either party to maintain the same marital lifestyle that each was previously able to afford while living together and sharing costs. Nonetheless, following a long term marriage of twenty-six years it is equitable for the court to explore the possibility of placing *both* parties—not just one party—as reasonably close to the past marital standard of living as practical under the circumstances.

In the present case, the parties shared and paid their joint expenses for virtually their entire adult lives, financially intertwined and primarily funded by defendant's income while plaintiff raised the children and domestically managed the home. The parties jointly developed and achieved a modest middle class lifestyle through the joint efforts of the marital partnership, with plaintiff deferring her own education and career goals in the process. By the end of the marriage, the parties' combined reasonable budget was approximately $4000 per month. Both parties now reasonably require more than $2000 per month living separately. Between roof expenses, auto expenses, and personal expenses, the court finds that each party theoretically needs a minimum of at least $3000 in funds per month separately in order for both to maintain a lifestyle anywhere near that established during the marriage. Even this amount may not be enough to place both parties up to their prior standard of living, but at the very least it will bring them both reasonably closer to that prior standard under the circumstances.

After the divorce complaint was filed, the supporting spouse's income substantially increased. His additional available funds are relevant on alimony as a viable source to help bring both parties

closer to the financial lifestyle they enjoyed during the marriage. If the court artificially ignores defendant's available post-complaint financial resources and only considers the defendant's lesser, pre-divorce income, there will not be enough money available for both parties to separately approach the same lifestyle that they had during the marriage.

Of course, marginal cost estimation does not mean that the supporting spouse has to finance the lifestyle of a supported spouse at a level substantially greater than the marital lifestyle. However, by considering defendant's post-complaint earnings, there is naturally more money available to bring the parties closer to the marital status quo. The court may of course also consider any additional resources and increased income potential of plaintiff as well.

In this case, the parties had a middle class lifestyle but essentially lived paycheck to paycheck. After twenty-six years together they amassed virtually no savings. If the Court were now prohibited from considering defendant's post-complaint spike in income as an additional funding source, the result would be highly unequitable. Defendant could rather easily use all of the additional post-complaint funds at his disposal to subsidize his lifestyle and maintain himself at a level equal to or even greater than the marital lifestyle. Reciprocally, plaintiff would be completely unable to maintain anything close to the marital standard of living on her own. Such a result is inappropriate in this case and contrary to the statutory language of *N.J.S.A.* 2A:34-23 which directs consideration of defendant's present ability to pay in the overall alimony analysis.

### *ADDITIONAL FACTOR # 2: "MOMENTUM OF THE MARRIAGE"*

Additionally, New Jersey case law establishes and recognizes the concept of "momentum of the marriage" as an appropriate legal principle for consideration in an alimony analysis.

"Momentum of the marriage" recognizes the reality that in many instances, one's occupational efforts often start off by yielding small and modest level earnings. However, these efforts may serve as a strong springboard into higher future earnings. Through continuing education, experience, and perseverance, it is fairly common for the fruits of one's occupational labors to ripen well after the seeds are planted.

 A payee spouse may be entitled to enjoy the benefit of an increase in the payor spouse's financial picture to the extent it was the "momentum of the marriage" which brought about the increase. *See Cargulia v. Cargulia*, 309 *N.J.Super.* 649, 654, 707 *A.*2d 1100 (Ch.Div.1996) (adopting the phrase and citing *Guglielmo v. Guglielmo*, 253 *N.J.Super.* 531, 543–44, 602 *A.*2d 741 (App.Div.1992) as the basis for the concept). In *Guglielmo v. Guglielmo, supra,* the court developed the "momentum of marriage" concept in a post-judgment application by an ex-wife for an alimony increase following her ex-husband's substantial increase in income. 253 *N.J.Super.* at 543–4, 602 *A.*2d 741. The court agreed with the ex-wife's position, reasoning as follows:

> Plaintiff may be able to provide herself . . . with the basic fundamentals for living, but mere survival of the dependent spouse is not the proper standard to determine whether support should be modified. The supporting spouse's obligation contemplates the quality of the parties' economic life during marriage. . . .
>
> Indeed, changed circumstances are not limited in scope to events which were unforeseeable at the time of divorce. The supporting spouse has a continuing obligation to contribute to the maintenance of the dependent spouse at the former standard of living.
>
> . . . .
>
> We are entirely satisfied that a spouse who maintains the home while her husband's career advances should share in the rewards of their combined efforts. Recent history reveals that, most often, the husband's career advances and the wife will live through the lean years, bear the husband's children, and keep his home. We will not sanction an agreement which prohibits a woman devoted to her husband from enjoying the fruits of her labor just as they are to be reaped.
>
> Defendant contends that plaintiff is attempting to improve her lifestyle beyond that which she enjoyed during her life with him. We do not agree. Where a family's expenditures and income had been consistently expanding, the dependent spouse should not be confined to the precise lifestyle enjoyed during the parties' last year together. Defendant's income picture should be viewed with an eye towards the

future, since it was to this *potential* that both parties contributed during the marriage. The then existing earning potential of the working spouse may be shared by the spouse who kept the home, and the standard of living should be implemented through an adequate alimony award.

. . . .

Defendant is obligated to support plaintiff at least according to her former status, so long as he is economically able to do so. . . . (W)hile there may have been some question of the husband's ability immediately after the divorce to maintain his former wife at this level, defendant's substantial present salary warrants the alimony assessed and increased support. . . . Plaintiff is entitled to a portion of defendant's income in order to maintain the lifestyle she enjoyed during their marriage.

[*Ibid.* (citations omitted).]

*Guglielmo* was an opinion rendered in the context of a post-judgment application to increase alimony. However, the principles therein are logically applicable in a pre-judgment analysis as well. In the present case, the evidence strongly suggests that defendant developed his education and experience in his chosen field (auto part sales) throughout the course of the parties' extensive marriage. Defendant focused his occupational energies exclusively in the realm of auto parts. He did so during the marital partnership, where he was the primary financial provider while plaintiff was the primary domestic caretaker. While defendant gained experience in his craft, plaintiff maintained the household, cared for the children and provided support and encouragement for defendant in his professional endeavors.

As reflected in his earning history, the fruits of defendant's efforts in the auto part industry resulted in a steady and consistent increase in his annual income level, from $14,000 in 1981 to $59,000 by the end of the marriage and $76,000 shortly thereafter. The court finds by a preponderance of the evidence that defendant's ability to (a) obtain and resume work as a W–2 employee in the auto parts industry and (b) accomplish a personal best salary in a time of massive economic recession, is significant. During the relatively little time which passed between the end of the marriage and the present day, defendant was able to parlay his twenty-six year history in auto sales into a substantial earnings increase at a

time when millions of employees in other fields are losing their jobs or, like plaintiff, are surviving on unemployment.

The evidence clearly reflects that defendant's income in the auto parts industry steadily rose during the entire course of the parties' marriage. The court further finds that defendant was better able to concentrate on developing his skills and talents and expertise in auto parts during the marriage because he had a marital partner—plaintiff—who was pulling her own weight in the partnership by primarily running the household. The fruits of the parties' joint efforts during their partnership have now ripened into a proven ability by defendant to earn substantially higher income than he ever earned during the marriage.

Could defendant, in 2010, have on his own gone out following the failure of his business and earned $76,000 in the auto parts industry without the occupational foundation developed by both parties during the marriage? Could defendant have in two short years achieved high national ranking among auto parts salesmen without the auto part expertise he developed through both parties' energies and sweat equity expended over the past quarter of a century? In the alimony analysis, is it fair and equitable to ignore plaintiff's lifetime contribution towards defendant's present day earning potential? For each question, the court finds the answer to be no.

For certain, not every post-complaint increase in income is directly attributable to "marital momentum". For example, if following separation defendant had gone into an entirely new field and found instant success, or if he won the lottery, or if he made shrewd post-complaint investments having nothing to do with prior marital efforts, such events would not necessarily have their roots in marital momentum. Further, if a very substantial period of time had passed between the end of the marriage and defendant's spike in income, and if there were significant intervening and independent events during that time which directly increased defendant's earning potential (such as defendant returning to college and obtaining an advanced degree), it might be less

appropriate to consider such an income increase as traceable to the "momentum of the marriage." In this case, however, there was no substantial gap in time between the end of the marriage and the increase in income. Further, there were no identifiable and significant intervening events which independently increased defendant's earning potential.

The court finds by a preponderance of the evidence that defendant's ability to earn the level of income which he presently earns is in fact directly attributable to the hard work and combined labors of both parties during their lengthy marriage. The court further finds that plaintiff's sacrifice of her own career goals in psychology to support defendant's advancement in the field of auto parts is a compelling equitable consideration. As noted, *supra*, the alimony statute expressly authorizes consideration of "interruption of personal careers or educational opportunities" in determining spousal support. *See N.J.S.A.* 2A:34–23(a)(9).

For the foregoing reasons, the court will consider defendant's post-complaint increase in income as relevant in determining his alimony obligation to plaintiff.